143 So. 909

### WAGNER v. ALABAMA FARM BUREAU FEDERATION.

#### 3 Div. 15.

Supreme Court of Alabama.

Oct. 6, 1932.

Rehearing Denied Nov. 3, 1932.

514

Ball & Ball, of Montgomery and Mark V. Weatherford, of Albany, Or., for appellant.

Goodwyn & Goodwyn and Hill, Hill, Whiting, Thomas & Rives, all of Montgomery, for appellee.

THOMAS, J.

The suit was on a contract and resulted in judgment for defendant.

The appeal is from a judgment of nonsuit suffered by the plaintiff as a consequence of the action of the trial court sustaining demurrers to the complaint.

Count 1 alleges that in the year 1930, plaintiff, H. L. Wagner, as seller, and defendant, Alabama Farm Bureau Federation, as buyer, entered into a contract by which the plaintiff agreed to sell and defendant agreed to buy all of the Austrian winter peas grown by plaintiff, seller, on 1,000 acres during the season 1930—31; that thereafter plaintiff and defendant modified said contract by written amendment as follows:

"This amendment to the contract made by and between H. L. Wagner and the Alabama Farm Bureau is as follows:

"The Alabama Farm Bureau agree to buy and H. L. Wagner agrees to sell all the available Austrian peas up to one million two hundred and fifty thousand pounds at three dollars and seventy five cents ($3.75) f. o. b. cars or truck as ordered by buyers. That instead of the price being $3.85 as mentioned in the contract it is to be reduced to $3.75 for the entire available tonnage up to above amount. Terms and quality and all other agreements to remain same as contract."

It is further averred that plaintiff on his part fully performed the contract and amendment thereof; that pursuant thereto there became available at the time and place provided in said contract, and "there was appropriated to said contract by plaintiff 1,-250,000 pounds of said peas, cleaned and inspected and in all respects as specified in said contract, of all of which defendant had notice; that 923,000 pounds of said peas were ordered shipped by plaintiff under defendant's instructions, and were shipped and accepted by defendant, but defendant, although often requested, has without just cause refused to give plaintiff shipping instructions for the remaining 326,700 pounds of peas or any part thereof, and although plaintiff duly offered to ship said peas, the defendant on,

to-wit, September 25th, refused to accept said peas."

The original contract is made an exhibit to the count. By its terms the seller agreed to duly prepare, or cause to be prepared, and seed to Austrian peas 1,000 acres in the state of Oregon; to care for and harvest said crop during said season; and load for shipment as stipulated to the buyer as instructed by the buyer, packed in the manner designated. Terms are stated in the contract to be "sight draft bill of lading attached, together with invoice and a certificate of inspection, cash on arrival of documents at Montgomery, Alabama." It is further provided that: "Cleaning is to be done not later than August 15th, 1931; * * * that he," the seller, "will load said seed crop for shipment so that the first shipment will be not later than August 15, 1931." There are in said contract further stipulations as to quality and provisions for inspection, shipment, and notice of shipment. It is further "understood and agreed that the seller will have several hundred acres of said seed in addition to that provided for in this contract," and the buyer is given an option to purchase such additional crop under the same terms and conditions; such option to be exercised before midnight of June 1, 1931.

■ The argument against this count, as raised by the demurrer, is twofold: First, that the word "available," as employed in the amended contract, referred alike to the seller and the buyer; witnessing an intention on the part of the seller to sell such peas.as he could procure, and the intention of the buyer to purchase only such peas as it required, the figure "up to one million two hundred and fifty thousand pounds" being merely an estimate of the buyer. Second, that if the word "available" be held to apply to the seller alone, the amended contract is rendered indefinite and uncertain as to its subject-matter, and makes it incapable of enforcement; that is to say, that the amended contract is unilateral.

The action of the parties in materially amending or modifying their contract will be ascribed to a rational purpose indicated by its terms. By the original contract the plaintiff agreed to sell, and defendant to buy, the yield of 1,000 acres at a stipulated price of $3.85 per hundred pounds, f. o. b. seller's shipping point, etc., and the aggregate amount of the yield did not enter; much or little, the plaintiff agreed to sell, and the defendant agreed to buy, all the Austrian winter peas grown, or caused to be grown, by the seller on the acreage designated during the season 1930–31 of the grade and percentage of "minimum germination." There is no reference made in the original contract to the buyer's (defendant's) requirements. Its requirements were, or at-least, per the contract in excess of the yield of 1,000 acres indicated. The option granted to it to purchase the crop yield of such seed from an additional acreage, on the same terms, is consistent alone with such an intention. If, then, the parties had any rational and lawful purpose in entering into the new agreement, by the terms of which the price was reduced on Austrian peas "up to one million two hundred and fifty thousand pounds at three dollars and seventy five cents ($3.75) f. o. b. cars or truck as ordered by buyers, that instead of the price being $3.85 as mentioned in the contract it is to be reduced to $3.75 for the entire available tonnage up to the above amount," its purpose must have been to sell and to buy yet additional seed up to 1,250,000 pounds. Plaintiff having surrendered and defendant having secured respective and material advantages under this amended contract, namely, by defendant a reduction in price, some moving and in a way counterbalancing benefit to the plaintiff must be sought. That is found in the further obligation of the defendant to take all of plaintiff's available supply of peas up to 1,250,000 pounds. The reasonable construction to be placed upon the contract so modified is, we hold, that the word "available," as used in the amended contract, meant procurable by plaintiff and capable of being appropriated to this contract within its terms.

Thus we are brought to the second phase or group of grounds of demurrer, that the contract is unilateral and wanting in mutuality.

In American Tie & Timber Co. v. Naylor Lumber Company, 190 Ala. 319, 322, 323, 67 So. 246, 247, this court had under consideration an unexecuted contract by which the purchaser had agreed to take, and the seller to deliver, "as many heart cross-ties as it is possible for them," the seller to deliver "at Moss Point, for twelve months from the above time" at prices specified. It was there held that such contract was not sufficiently certain as the basis of an action for its breach, it being shown that the quantity of cross-ties which might be thus accumulated depended on uncertain elements and material contingencies, and arbitrary action of the parties. The breach asserted was that the purchaser, at a time when the seller stood ready, able, and willing, and offering to carry out the provisions of the contract, "notified the seller that it would no longer carry out the provisions of said contract," and refused to do so and accept other cross-ties. The court said: "This agreement is readily distinguishable from those where the quantity to be bought and sold is 'ascertainable with reasonable certainty.' It has been correctly held that a contract to purchase the entire output of a certain mill or manufacturing plant, for a given time, at a given price, is valid; and likewise a contract to purchase all of the coal of a certain quality that might

be needed for a certain plant, at a certain price and for a fixed period, is valid. In such cases the quantity, though it may depend to some extent on the will or effort of one of the contracting parties, can be ascertained with reasonable certainty; but in the present case the quantity depends upon so many uncertain elements and contingencies that we cannot say that it can be brought within the foregoing principle. The quantity to be bought and sold under the present contract (as many heart cross-ties as it is possible for the appellee to accumulate at Moss Point within 12 months) depends on the financial ability, the business capacity, the industry, the efficiency, and credit of the appellee, the supply of labor, all under constantly changing conditions, as well as on the supply and demand for heart cross-ties with the world as a market, and also on the uncertainty of transportation facilities and the responsibility of dealers in heart cross-ties and their respective abilities to perform such contracts as they might make with the appellee for cross-ties which might be bought from such dealers by the appellee for delivery under this contract."

The condemnation of the court, as we shall see, was limited to the contract in so far as it was unexecuted. The court had this to say of the contract to the extent of its execution on the seller's part (190 Ala. 324, 67 So. 246, 248): "There is evidence in the case, somewhat conflicting, to the effect that, prior to the time when the appellant refused to further perform the contract, the Naylor Lumber Company had accumulated a quantity of cross-ties at Moss Point under the contract and according to the specifications. After these cross-ties had been so accumulated, the contract was executed to that extent, and it would be unconscionable to allow appellant to say that it would not comply with the terms of the contract and refuse to accept the cross-ties so accumulated. McIntyre Lumber & Export Co. v. Jackson Lumber Co., 165 Ala. 268, 51 So. 767, 138 Am. St. Rep. 66; Central R. R. & Banking Co. v. Cheatham, 85 Ala. 292, 300, 4 So. 828, 7 Am. St. Rep. 48. The law does not favor the destruction of contracts for uncertainty, and leans against such a construction as renders them unenforceable. McIntyre Lumber & Export Co. v. Jackson Lumber Co., supra; Boykin v. Bank, 72 Ala. 262, 47 Am. Rep. 408."

See, also, Holst & Co. v. Harmon, 122 Ala. 453, 26 So. 157; Elmore, Quillian & Co. v. Parrish Bros., 170 Ala. 499, 54 So. 203. The case of Naylor Lumber Co. v. American Tie & Timber Co., 197 Ala. 403, 73 So. 12, also cited by appellee, is to a like effect. Scott v. Moragues Lumber Company, 202 Ala. 312, 80 So. 394.

Many other authorities might be cited which hold agreements or contracts of the nature of the one involved in Naylor Lumber Co. v. American Tie & Timber Co., supra, uncertain in their incipiency, which are unenforceable and insufficient to support an action for a breach thereof so long as they remain executory. Such was the fact or holding in McKenzie Mercantile Co. v. Land, 207 Ala. 332, 92 So. 431; Vinson v. Little Bear Sawmills, 216 Ala. 441, 113 So. 385; Southern Fuel Co. v. Southern R. Co., 215 Ala. 355, 110 So. 715; Lucas E. Moore Stave Co. v. Kennedy, 212 Ala. 193, 101 So. 894; Jones v. Lanier, 198 Ala. 363, 73 So. 535; McCormick v. Tissier, 222 Ala. 422, 133 So. 22. All of these cases, however, recognize the principle stated in McIntyre Lumber & Export Co. v. Jackson Lumber Co., 165 Ala. 268, 51 So. 767, 138 Am. St. Rep. 66; Stewart's v. Redmond, 219 Ala. 365, 366, 122 So. 315; Scott v. Moragues Lumber Company, supra; Baker v. Howison, 213 Ala. 41, 45, 104 So. 239, 52 A. L. R. 1452; Majestic Coal Co. v. Anderson, 203 Ala. 233, 82 So. 483; King v. Scott, 217 Ala. 511, 116 So. 681; Kenan, McKay & Spier v. Home Fertilizer & Cotton Oil Co., 202 Ala. 29, 79 So. 367; Electric Lighting Co. of Mobile v. Elder, 115 Ala. 138, 21 So. 983; Goodwin v. Adler, 220 Ala. 69, 124 So. 108, that, although there was originally no obligation on the part of the seller to produce, yet where the seller acts upon the promise of the buyer and does produce, the buyer cannot avoid his obligation to take that which has been actually produced on the faith of his agreement.

On demurrer, the allegations of the count are taken as true. Count one alleges that within the terms of the contract the stated quantity of peas was produced, made available, and appropriated to the contract. Notwithstanding the seller was not, in the beginning, bound to make available any peas, yet, having produced and made them available, he was bound to appropriate them to the contract, and the buyer was bound to take them under that contract. We are therefore at the conclusion that the trial court erred in sustaining the demurrer to count one.

Other counts of the complaint are merely by way of elaboration of the first, by setting out the correspondence that led up to and explained the terms of the contract. That is to say, in these counts the negotiations leading up to the execution of the amended contract are set out in more or less detail. These negotiations, carried on through communications between the defendant and the plaintiff, serve to strengthen the view hereinabove expressed as to the ambiguous phrase or the word "available." They disclose that long after the original contract was executed, which is not shown more defi-

nitely than "sometime in the year 1930," the defendant anticipated requirements for the planting, cultivating, gathering, or collecting a larger quantity of peas than would be supplied by its original contract with plaintiff. In one of its communications it was stated that its requirements would probably run to 2,000,000 pounds; in other of said communications to the defendant reference is made to acreage in Oregon and other states planted to peas and given as an added source of supply, in a general way, and upon which the plaintiff might draw. In the preliminary negotiations defendant sought to trade upon the basis of its "entire needs," and the plaintiff's proposals were based upon "available seed" or "the available supply." On August 2, 1931, defendant's agent in Oregon telegraphed the defendant, stating that plaintiff wanted an estimate of defendant's requirements the following day so that he could tell whether to sell the available seed to others. And by way of reply, on August 4th, defendant telegraphed its agent instructions to "close with Wagner [the plaintiff] for one million two hundred fifty thousand pounds." Pursuant to the aforementioned and exhibited negotiations, the amendment to the contract was executed on August 7, 1931, and in which defendant was accorded a substantial reduction in price. In the light of these negotiations, it is clear that the ambiguous provision for the purchase and sale of "all the available Austrian peas up to one million two hundred and fifty thousand pounds," in the amended contract instead of that originally agreed upon for the purchase and sale of a definite quantity fixed by acreage limitations, was for the benefit of the seller, and designed to protect him against the contingency of being unable to procure such a quantity.

The complaint sets out communications passing between the parties subsequent to the execution of the amended contract by way of construction of the parties of their agreement or points of disagreement. It appears that on September 9, 1931, plaintiff wired defendant for shipping instructions for the balance of peas; and to this defendant in reply wired: "Our people not yet ready for additional peas. Will advise you later." Again, on September 24th, plaintiff wired for shipping instructions, and on the day following defendant wired: "Account continued drouth impossible handle more peas. Should by any chance requirements increase will contact you."

The added counts of the complaint were not subject to the demurrer. For the errors indicated, the judgment is reversed and the cause is remanded.

Reversed and remanded.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.